Frank P. ADLESON and Alice R. Adleson, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C–79–3345–WWS.

United States District Court, N. D. California.

Oct. 1, 1981.

Charles A. Dyer, Cotchett, Dyer & Illston, San Mateo, Cal., for plaintiffs.

R. de Saint Phale, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHWARZER, District Judge.

I. *Background of the Case*

This action is one of many claiming damages for injuries arising out of the federal government's attempt in 1976 to inoculate the larger part of the adult American population against a threatened epidemic of swine flu (A/New Jersey/1976 influenza). Although the epidemic did not materialize, over forty-eight million persons were vaccinated after the immunization program commenced in October, 1976, and a certain number of vaccinees suffered illness or death in the period immediately following immunization.[1]

The Center for Disease Control collected reports of morbidity and mortality among vaccinees, and classified them in order to discover any association of vaccination with a particular disease or condition. The CDC found numerous cases of minor reactions to the swine flu injections (fever, headache, malaise, etc.), and a few cases of anaphylac-

---

1. The federal Center for Disease Control in Atlanta coordinated a national surveillance in connection with the swine flu immunization program, requiring all state and territorial health departments to report any illnesses requiring medical attention that followed influen-za immunization. Altogether, nearly 5000 incidents were reported, including 223 fatalities. *See* Retailliau, Hattwick, Curtis, Storr & Caesar, *Nationwide Influenza Vaccine Reaction Surveillance, 1976–1977* (Center for Disease Control, 1978).

tic shock. Otherwise, the instances of sickness and death were attributable to a wide variety of causes and did not exceed the levels expected in the general population, with one exception: there were excess cases of a relatively rare neurological disorder known as Guillain-Barre Syndrome (GBS).[2] GBS, a rapidly evolving paralysis that typically leaves patients debilitated, and often hospitalized, for several weeks or months, had not previously been associated with influenza immunizations.[3]

By early December, 1976, CDC was investigating half a dozen GBS cases among swine flu vaccinees.[4] The investigation expanded as new cases were reported, and on December 16, 1976, CDC declared a moratorium on the swine flu vaccination program because of the apparent risk of GBS complications.[5]

In August, 1976, before the immunization program went into effect, Congress approved the National Swine Flu Immunization Program of 1976, Pub. L. 94–380, 42 U.S.C. § 247b (Supp. III 1979), authorizing the mass inoculations. That Act also established an exclusive remedy for persons claiming damages for personal injury or wrongful death as a result of swine flu inoculations. Under the Act, the exclusive remedy for injuries due to the acts or omissions of program participants is an action against the United States under the procedures of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1976), rather than against any manufacturers or health care providers. The FTCA action against the government is governed by the substantive law of the place where the alleged wrongful act or omission occurred. 42 U.S.C. § 247b(k)(2)(A); 28 U.S.C. § 1346(b) (Supp. III 1979).

Plaintiff Frank P. Adleson filed for compensation under this scheme for a neurological disorder he now characterizes as chronic inflammatory polyradiculoneuropathy (CIP), a syndrome similar to GBS but with a slowly-developing rather than acute course. Plaintiff asserts that he was vaccinated for swine flu on December 8, 1976, in Palo Alto, California, and that he developed CIP as a consequence of the injection. His wife, Alice R. Adleson, joined the action, claiming loss of consortium as a result of the same injuries to her husband.

## II. *Procedural Posture of the Case*

Plaintiffs filed suit in the Northern District of California in November, 1979. Pursuant to 28 U.S.C. § 1407 (1976), the Judicial Panel on Multidistrict Litigation transferred this action to the District of Columbia for consolidated pretrial proceedings, including nationwide discovery. Following entry of a Stipulation and Final Pretrial Order, the Panel remanded the action to this Court in May, 1980.

The Multidistrict order primarily concerns claims of injuries due to GBS, the neurological disorder that demonstrably increased in frequency at the time of the immunization program. The Government stipulated that plaintiffs who developed GBS after receiving a swine flu vaccination need not establish a theory of liability, such as strict liability, negligence, or breach of warranty. Only causation and damages need be proven in that event. Based on the statistical correlation of GBS attacks following swine flu vaccination, causation has generally been acknowledged if the onset of

---

**2.** *Id.* at 461–464.

**3.** Schonberger, Hurwitz, Katona, Holman & Bregman, *Guillain-Barre Syndrome: Its Epidemiology and Associations with Influenza Vaccination,* 9 Ann.Neur. (Supp.) 31, 32 (1981).

**4.** Retailliau, et al., *supra* note 1, at 10–12.

**5.** *Id.* at 16–17. Approximately five hundred cases of GBS were eventually reported by persons who had been inoculated, some of them months before the onset of symptoms. No time limit was set on reports of post-vaccina-

tion GBS. Although the number of GBS cases was not large, it represented a dramatically increased risk of GBS symptoms within six weeks of immunization. *See* Langmuir, *The Swine Influenza Virus Vaccine-Guillain Barre Incident in the United States* 1, 12, Symposium on Guillain-Barre Syndrome, Royal Society of Medicine (London, April 11, 1978) (M.D.L. Doc. # 72); Schonberger, *et al., supra* note 3, at 31; *see also* testimony of Dr. John M. Eaton in the instant case, Trial Transcript at 34.

GBS symptoms occurred within ten weeks of the injection.[6]

As initially pleaded, Adleson's complaint alleged the onset of GBS in an acute attack on August 12, 1977, eight months after the swine flu inoculation. But plaintiff later modified his position, alleging the presence of mild or moderate neurological symptoms within two weeks after the injection. Plaintiff argues that these earlier symptoms are indicative, not of GBS, but of the disorder CIP, which often takes a gradually progressive course over a period of months before an acute attack or before the weakness becomes debilitating. Plaintiff's theory depends on proof that the diagnosis of CIP is correct and that gradually evolving CIP which flares up months after a swine flu shot is causally related to the injection.

Because of the potentially dispositive nature of these disputed questions, the Court, with the consent of the parties, ordered a separate trial on the issue of proximate cause, pursuant to Fed.R.Civ.P. 42(b). The Court heard the testimony of plaintiff's expert, Dr. Eaton, and argument of counsel. In addition the parties submitted the proposed testimony and depositions of the treating physician, Dr. Normanly, and defendant's expert, Dr. Burton, along with a considerable volume of medical reports and articles, many collected during the Multidistrict phase of discovery.

### III. *The Issue Presented*

For purposes of this limited trial on causation, the parties stipulated (1) that Frank Adleson received a swine flu immunization on December 8, 1976, and (2) that Mr. Adleson's medical history as reported to Dr. Eaton in April, 1981, is correct. The significance of the medical history contained in Dr. Eaton's report is that it includes, for the first time in Mr. Adleson's medical records, an account of mild or moderate neurological symptoms following the swine flu injection but prior to the acute attack and hospitalization in August, 1977. Those symptoms are the chief support for Dr. Eaton's diagnosis of CIP gradually progressing after the swine flu inoculation in December, 1976. The occurrence of those later-reported symptoms is not at issue in this trial. Therefore, given those symptoms (the assumption underlying this decision) the diagnosis of CIP is at least plausible.[7]

The issue before the Court is whether plaintiffs have sustained their burden of showing that Mr. Adleson's influenza immunization more probably than not was the cause of a slowly-evolving CIP which was exacerbated by a viral infection suffered eight months after the vaccination.

### IV. *The Facts*

#### A. *Guillain-Barre Syndrome*

The testimony and exhibits submitted at trial on the causation issue explain that, in the words of the preeminent text on peripheral nerve disorders, GBS (or acute inflammatory polyradiculoneuropathy, AIP) is an acutely or subacutely evolving paralytic disease "of unestablished etiology."[8] A polyradiculoneuropathy is a disorder of the nerve roots as they leave the spinal column; acute and subacute evolution refers to the sharp and sudden or relatively short-term progression of symptoms to a peak of disability. The terms GBS or AIP (and their many synonyms) describe, not a single, well-defined disease,[9] but a collection of similar clinical, pathological, and laboratory presentations. In order for a doctor to diagnose GBS, these features must not be attributable to a diagnosed systemic dis-

---

**6.** *See* Langmuir, *supra* note 5, at 13; *see also, e. g., White v. United States,* No. C–78–14–Y (N.D.Ohio, July 31, 1981), at 2; *Sanders v. United States,* No. C–80–31–N (E.D.Va., July 24, 1981), at 2–4.

**7.** *See* note 29, *infra* and accompanying text.

**8.** Arnason, *Inflammatory Polyradiculoneuropathies,* Chapter 56 of P. Dyck, P. Thomas, P.

Lambert, Saunders, Diseases of the Peripheral Nervous System, at 1110 (1975).

**9.** *See* Steinberg, *Modulation of a Complex Immune System,* 9 Ann.Neur. (Supp.) 117, 122 (1981) ("It is likely that Guillain-Barre Syndrome (GBS) is, in fact, a syndrome and not a disease, *i. e.,* it probably has several distinct causes.").

ease, such as lead poisoning or colitis, that would be capable of producing similar symptoms and results.[10] The causes—or etiology—of GBS are uncertain because a number of different antecedent events seem to trigger or signal the onset of the disorder, and in one-third or one-half of the cases of GBS there is no ascertainable antecedent event.[11]

Although the causes of GBS are uncertain and its classification is indistinct, the pathology of the nerve disorder is somewhat better understood. The most probable explanation at present is that a malfunction of the immune system causes the body's antibodies to attack its own tissue.[12] Lymphocytes infiltrate the peripheral nerve and destroy myelin, the fatty insulation surrounding peripheral nerves. Gaps in the myelin sheath interrupt the transmission of neural impulses in much the same way that worn insulation can cause short-circuiting in an electrical wire. The result is weakness or paralysis of the muscles served by that nerve until there is sufficient remyelination, if there ever is, to reestablish the connection.

Other diseases can bring about a similar pathology, however, and there are no conclusive laboratory tests to identify GBS.[13] Instead, doctors must look to the pattern of symptoms, course of development, electrodiagnostic results, and laboratory findings in order to make a positive diagnosis of GBS. The National Institute of Neurological and Communicative Disorders and Stroke (NINCDS) produced diagnostic criteria for GBS after the 1976 swine flu incident to aid field examiners in diagnosing the syndrome.[14] These criteria include certain prominent features: a progressive and relatively symmetrical motor weakness or paralysis; areflexia (loss of tendon reflexes); rapid development from onset over a period of two to four weeks; only mild sensory symptoms; an elevated level of protein in the cerebrospinal fluid (CSF), typically after the first week of symptoms; markedly slowed rates of nerve conduction; and recovery that usually begins within four weeks of onset and usually concludes with the patient functionally recovered. These features may not all be present in a given patient, and there are variants in symptoms, course, and involvement, but they describe the classic presentation of GBS.

In the 50–70% of GBS cases where patients identify an unusual antecedent event, viral infections are most commonly linked to onset of GBS symptoms. Typically, the patient recovers from flu symptoms a few days or weeks before the GBS attack.[15] Other reported antecedent events include bacterial infections, surgery, fever therapy, neoplasia, and antirabies vaccination.[16] Since the 1976 swine flu episode, influenza vaccination has been considered an antecedent event, although the incidence has been unremarkable outside of the swine flu cases.[17] It is not known how these antecedent events trigger the autoimmune response that leads to demyelination, even assuming

10. Several systemic diseases are known to cause neuropathies that present similar symptoms and pathology as those characteristic of GBS. They include heavy metal poisoning, colitis, uremia, carcinoma, lymphoma, and diabetes mellitus. See Dyck, Lais, Ohta, Bastron, Okazaki & Groover, *Chronic Inflammatory Polyradiculoneuropathy*, 50 Mayo Clinic Proc. 621, 634 (1975); Dalakas & Engel, Chronic Relapsing (Dysimmune) *Polyneuropathy: Pathogenesis and Treatment*, 9 Ann.Neur. (Supp.) 134, 135 (1981).

11. *Id.* at 1114; Eaton, Trial Transcript at 32.

12. Arnason, *supra* note 8, at 1110, 1114–15; Asbury, *Diagnostic Considerations in Guillain-Barre Syndrome*, 9 Ann.Neur. (Supp.) 1 (1981); Eaton, Trial Tr. at 5.

13. Asbury, *supra* note 12, at 2; Eaton, Trial Tr. at 55–56.

14. *See* Asbury, Arnason, Karp & McFarlin, *Criteria for Diagnosis of Guillain-Barre Syndrome*, 3 Ann.Neur. 565 (1978).

15. Arnason, *supra* note 8, at 1110.

16. *Id.* at 1110–1114.

17. Schonberger, *et al.*, *supra* note 3, at 31–32.

that this is indeed the pathogenesis of the disease.[18]

### B. *Chronic Inflammatory Polyradiculoneuropathy*

GBS is ordinarily a monophasic, one-time attack of severe weakness or paralysis. There are infrequent instances of patients suffering one or more relapses, or subsequent attacks.[19] But there are other cases—much rarer than monophasic GBS attacks—[20] where patients are afflicted with a pathologically similar demyelinating syndrome that progresses gradually or in a stepwise pattern over a period of months or years, and from which patients seldom fully recover. This condition is known as chronic (as opposed to acute) inflammatory polyradiculoneuropathy, or CIP.[21] This is the disorder that plaintiff allegedly suffered as the result of a swine flu inoculation.

Like GBS, CIP involves segmental demyelination of peripheral nerves, resulting in motor weakness or paralysis. Also like GBS, CIP is usually signalled by elevated CSF protein levels, slowed nerve conduction, and an absence of systemic diseases that might otherwise explain the symptoms.[22] Because the condition is so rare, CIP is not even as well understood as GBS, and few descriptive reports of CIP appear in the literature.[23] Nevertheless, there are a handful of case studies, and they suggest several differences between monophasic GBS on the one hand and CIP on the other, chiefly in the course of the disease.[24] CIP generally takes six to twelve months to reach its peak, compared to the acute progression of GBS in a matter of two to four weeks. Even when CIP has crested, it may recur; and it generally leaves its mark in permanent neurological deficits that disable patients to varying degrees.[25] This course

---

18. *See* Arnason, *supra* note 8, at 1111, 1114; Asbury, *supra* note 11, at 1; Schonberger, *et al., supra* note 3, at 31; Cook & Dowling, *The Role of Autoantibody and Immune Complexes in the Pathogenesis of Guillain-Barre Syndrome*, 9 Ann.Neur. (Supp.) 70, 76 (1981).

19. Dr. Arnason, *supra* note 8, at 1134, reports that relapses occur in approximately 3% of AIP (GBS) cases, and manifest essentially the same symptoms as the monophasic attacks of AIP. *See also*, Thomas, Lascelles, Hallpike & Hewer, *Recurrent and Chronic Relapsing Guillain-Barre Polyneuritis*, 92 Brain 589, 602 (1969). Mr. Adleson's is not a relapsing case: there were mild symptoms and then an acute attack from which he has not entirely recovered.

20. *See* Eaton, Trial Tr. at 27 (estimating that CIP occurs one-tenth as frequently as GBS).

21. *See generally* Arnason, *supra* note 8, at 1135; Dyck, *et al., supra* note 10.

22. Dalakas & Engel, *supra* note 10, at 134–35.

23. *See* Dyck, *et al., supra* note 10, at 621.

24. Dalakas & Engel, *supra* note 10, at 142–43 summarize a number of other differences between CIP and GBS. Antecedent events are quite frequently reported for GBS; researchers dispute their presence and significance in CIP cases. *See* discussion below, Section VB. Sensory abnormalities are infrequent in GBS cases but usual in instances of CIP. Cranial nerve involvement, affecting the muscles of the face

and head, is common in GBS are rare in CIP. Certain antigens tend to be associated with CIP alone, and although protein levels in the cerebrospinal fluid tend to be elevated in both syndromes, single proteins are typically found in CIP patients, as opposed to multiple bands in patients suffering GBS attacks. CIP patients often respond to corticosteroid treatment, while the results of this drug therapy in GBS cases have been inconclusive, despite decades of application. Finally, there is the pattern of recovery for GBS patients, and of continuing disability—despite periods of remission—for CIP patients.

None of these distinguishing factors is absolute, however. They describe generalities and tendencies, not sure diagnostic tests. For example, although most GBS patients recover full functional capacity, "a proportion of patients show permanent deficits of varying severity" and some terminate in death. *See* Arnason, *supra* note 8, at 1121. Arnason estimates that 15% of patients with GBS fail to recover functionally within six months. To similar effect, *see* Hughes, Kadlubowski & Hufschmidt, *Treatment of Acute Inflammatory Polyneuropathy*, 9 Ann.Neur. (Supp.) 125, 125–26 (1981); Thomas, *et al., supra* note 19, at 589–90. Thus, Dr. Normanly and Dr. Burton diagnosed GBS in Mr. Adleson's case despite his incomplete recovery, while Dr. Eaton relied on that feature to support his view that Adleson suffers from CIP.

25. *Id.* at 135; *see also* Hughes, *et al., supra* note 24, at 125–26.

contrasts with GBS, which is usually mono-phasic and which usually ends in the patient's complete or nearly complete recovery.

Dr. Asbury observes that cases with an intermediate course "occur frequently enough to blur the diagnostic delimitation of GBS from the more chronic types of acquired demyelinative neuropathy."[26] Still, the weight of medical opinion supports the separate classification of the acute and chronic syndromes, both because of generalized differences in features and recovery, and because, as Hughes, et al., put it in restricting their conclusions on treatment to AIP: "the mere facts of chronicity and relapse indicate a clinical distinction that might reflect an important difference in pathogenesis."[27] Thus, conclusions based on temporal relationships between GBS and the swine flu vaccine are not necessarily transferrable to the CIP syndrome.

## C. Plaintiff's Medical Condition

For purposes of this discussion the Court accepts the following statement of Mr. Adleson's symptoms and medical condition.

Shortly after the swine flue injection, plaintiff recalls a metallic taste in his mouth and a sensation of nausea. There were no other immediate reactions to the flu shot, but within two weeks plaintiff felt unduly tired and had difficulty using his leg. Over the next few months these symptoms recurred, sometimes forcing plaintiff to lift his leg with a hand in order to change pedals while driving, or press down on his leg to apply sufficient pressure to the brake pedal. Plaintiff, the owner of a bicycle shop, had trouble lifting bicycles to the work rack, and he found it difficult to climb stairs.

Plaintiff did not see a doctor about these symptoms. He attributed his fatigue to obesity, and commenced a weight reduction program under the supervision of his physician, Dr. Munson. In August, 1977, eight months after his swine flu vaccination, plaintiff suffered a flu-like illness with di-arrhea and fever, and was given antibiotics. A week later, after having recovered from the gastrointestinal infection, plaintiff experienced a marked weakness in the lower extremities. He was unable to rise from his chair, and he had difficulty swallowing, as well. His condition of weakness worsened over the next twelve hours. Dr. Munson visited him at home and then had plaintiff transported to the emergency room at El Camino Hospital.

Dr. Normanly, a neurologist, examined plaintiff shortly after his admission to the hospital. Dr. Normanly found a degree of paralysis in all the limbs, an absence of tendon reflex, weakness of neck, jaw, and palate, and no sensory impairment.

After plaintiff was admitted to the hospital, his weakness progressed over the next two days to a flaccid quadriplegia with jaw and neck weakness, difficulty in swallowing, and respiratory weakness. A tracheotomy was performed, and plaintiff breathed with mechanical assistance for most of the three and a half months that he spent at El Camino Hospital. In June, 1977, plaintiff was transferred to Santa Clara Valley Medical Center for continuing care and rehabilitation. He remained there for the next seven months. An electromyogram taken at Santa Clara showed evidence of peripheral nerve disease consistent with the diagnosis of GBS.

Plaintiff's motor and respiratory capacity is still seriously diminished. He walks with the aid of leg braces and crutches, and he cannot perform mechanical tasks at his bicycle shop. Dr. Eaton, who examined him in April, 1981, considers patient's disability to be permanent and stationary.

## V. Discussion

## A. Plaintiff's Theory of Causation

Plaintiffs discarded their theory of a "smoldering" or delayed-effect GBS in their amended complaint. Only GBS occurring within about ten weeks of inoculation has

---

**26.** Asbury, *supra* note 12, at 1.

**27.** Hughes, *et al., supra* note 24, at 131.

been statistically correlated with swine flu immunization,[28] and the gastrointestinal illness Mr. Adleson suffered shortly before his acute attack is a common antecedent event for GBS, a much likelier cause than the flu shot eight months earlier.

Instead, plaintiffs contend that Mr. Adleson experienced a progressive CIP condition. Their theory, as propounded by Dr. Eaton, is that the vaccination sensitized the immune system so that it malfunctioned, causing some gradual demyelination of peripheral nerves. This was manifested in the sporadic weakness Mr. Adleson felt after the December injection and before the attack in August. That attack, according to Dr. Eaton, was precipitated by the viral infection Mr. Adleson contracted in August, but it occurred because the flu shot had previously sensitized the autoimmune response. Assuming, for present purposes, the correctness of Dr. Eaton's diagnosis of CIP,[29] the Court must decide whether plaintiffs' theory of CIP causation implicating the swine flue vaccine is supported by a preponderance of the evidence.

Mr. Adleson did not report the early signs of weakness to a doctor, and so there are no laboratory findings (showing, for example, increased protein levels in the cerebrospinal fluid) that would tend to corroborate a diagnosis of CIP. If such findings were made shortly after the swine flue shot, they would suggest a causal link to the immunization.

In the absence of laboratory findings and early diagnosis of Mr. Adleson's condition, the effort to prove that CIP was induced by the December flu shot must depend on secondary inferences. A high incidence of CIP cases following such injections would be probative, as it has been in the case of GBS.

---

**28.** See note 6, *supra* and accompanying text.

**29.** It should be noted that the diagnosis itself is seriously disputed. The features Dr. Eaton relied on in forming a diagnosis of CIP were the early, mild symptoms of distal weakness (weakness in the extremities furthest from the spinal cord); the failure to recover completely or nearly completely; the involvement primarily of motor muscles; and the elevation of the cerebrospinal fluid (CSF) at the time of Mr. Adelson's admission to the hospital, within twenty-four hours of the onset of symptoms.

Rejecting a diagnosis of CIP, Dr. Burton and Dr. Normanly considered the earlier, mild symptoms of weakness to be inconclusive and possibly attributable to Mr. Adleson's other known health problems. Mr. Adleson had reported numerous complaints associated with obesity and his efforts to control it (including diet pills and shots); he consulted a psychiatrist periodically between December, 1976, and August, 1978, for depression and marital problems; he continued to take Dexedrine for afternoon fatigue (as he had done since the late 1950's); and he was suspected of being a diabetic at least since 1960. Without contemporaneous laboratory findings, they contend, it is impossible to connect these mild symptoms with an ongoing case of CIP in any convincing manner. Moreover, the laboratory tests conducted at the hospital did not reveal a high white blood cell count, as might be expected if the body were responding to a long-term inflammatory disease, although this finding is not, in itself, conclusive.

Moreover, the features Dr. Eaton found determinative are themselves inconstant guides to a diagnosis of CIP. Recovery cannot be expected for all GBS patients. See note 24, *supra.* Mr. Adleson showed signs of cranial nerve involvement (weakness of the jaw and palate, some difficulty in speaking and swallowing, occasional facial tremor) in addition to his motor weakness, and this is more characteristic of GBS than of CIP. His CSF protein was indeed elevated earlier than is usual for GBS patients: it was measured at 81 mg./100 ml. (or 81 mg./dl.), about twice the normal rate, when Mr. Adleson was first admitted to the hospital, and most GBS patients do not reach a significantly elevated level for 48 hours after onset of acute symptoms, often not for the first week. See Asbury, *supra* note 12, at 3. But others, by implication, do. *See also* Arnason, *supra* note 8, at 1123. And the CSF protein level measured in Mr. Adleson was considerably lower than those reported in the CIP patients of Dalakas & Engel, *supra* note 10, at 136, during periods of exacerbated symptoms: one patient registered 75 mg./dl., but all the others ranged between 114 mg./dl. and 522 mg./dl. Thus, the CSF protein level in Mr. Adleson's case is not a particularly strong indication that he suffered CIP rather than GBS.

The diagnosis of Mr. Adleson, assuming the occurrence of the symptoms experienced before August, 1977, is a close question. It is not necessary to decide that question, however, in view of the Court's determination that, even if Mr. Adleson had CIP, plaintiffs have not sustained their burden of showing that the CIP more probably than not was a consequence of swine flu immunization.

But no statistical correlation with influenza immunization has been demonstrated for CIP. Indeed, the CDC swine flu report revealed no correlation with any neurological disorder other than GBS. Nor is there sufficient understanding of the disease process in either GBS or CIP to predict that CIP could be vaccine-induced or to justify a conclusion by analogy that swine flu vaccine can cause CIP because it can cause GBS. The argument by analogy to GBS is especially weak because only acute GBS occurring within a few weeks of inoculation has been statistically linked to the vaccine, and the theory offered here describes a very gradual CIP progression for eight months before an acute attack.

The only other form of medical corroboration that might be available, then, is a survey of the literature for case histories or summaries of CIP cases showing a course and etiology comparable to that asserted by plaintiffs. Dr. Eaton referred to several articles and treatises in an effort to abstract descriptive reports that would support his theory of a vaccine-induced, gradual CIP aggravated by a viral infection. These are evaluated in the next section.

### B.  *CIP and Swine Flu Immunization*

The case reports of CIP patients cited by Dr. Eaton do not establish the probability that swine flu vaccine causes CIP. Dr. Arnason's text does not mention any antecedent immunizations as precipitating events for CIP,[30] and the study of twenty-five CIP patients by Dalakas and Engel revealed no antecedent events common to CIP onset.[31] Dyck, *et al.*, after examining fifty-three CIP patients at the Mayo Clinic over a ten-year period, listed "frequent history of preceding infection or receipt of foreign protein" as a "typical feature" of CIP.[32] None of the sample case histories detailed in their report includes a history of immunization immediately before the onset of CIP symptoms. The authors do not expand upon the issue of antecedent events except to say that one of the criteria they considered to favor a diagnosis of CIP was "a history of preceding infection, immunization, or receipt of biologic material (sting, bite, or injection) within a few weeks or months of the onset or of a period of worsening."[33] A course outline by Dr. Dyck also lists immunization as a preceding event for inflammatory demyelinating peripheral neuropathies,[34] but without indicating whether that applies to the chronic as well as the acute disorder. Similarly, Gathier and Bruyn list "polyneuropathy" as a complication of immunization,[35] but they do not specify chronic inflammatory polyneuropathy as a complication.

Dr. Eaton also cited Cohen,[36] who simply stated that "polyneuropathy or asymmetrical neuropathy may occur" following a passive immunization utilizing serum, again not specifying CIP or one of its synonyms. Dr. Eaton referred as well to Pollard and Selby, who reported an Australian case of relapsing demyelinating polyneuropathy.[37] But in that case the patient suffered a GBS-type attack three weeks after receiving tetanus toxoid and then similar acute attacks on two other occasions, each within a few days of a tetanus toxoid injection. This appears to be a case of relapsing acute polyneuropathy, not a gradual CIP progression with no acute symptoms for months after the injection, as in plaintiff's case.

30.  *See* Arnason, *supra* note 8, at 1135–37.

31.  Dalakas & Engel, *supra* note 10, at 136.

32.  Dyck, *et al., supra* note 10, at 621.

33.  *Id.* at 622–23.

34.  Plaintiff's Exhibit A (Dyck, typescript course outline for course on peripheral neuropathy, April, 1980).

35.  Gathier & Bruyn, *The Serogenetic Peripheral Neuropathies*, Chapter 6 of Vinken & Bruyn, Handbook of Clinical Neurology 95, 106 (1970).

36.  Cohen, *Differential Diagnosis of Toxic Neuropathy*, Chapter 22 of Vinken & Bruyn, Handbook of Clinical Neurology 552, 555 (1970).

37.  Pollard & Selby, *Relapsing Neuropathy Due to Tetanus Toxoid*, 37 J.Neur. Sciences 113 (1978).

Dr. Eaton referred, in addition, to a case reported by Thomas, *et al.*[38] An English schoolgirl suffered rapidly progressing GBS symptoms a week after a viral infection, recovered, and subsequently twice experienced an acute neuropathy within days or weeks of recovering from flu-like symptoms. Again, three acute attacks similar to monophasic GBS attacks occurred, not a long-term progression after an inoculation without an immediately following acute or subacute attack. The apparent absence of reported cases of gradual CIP subsequent to influenza immunization is reflected in Dr. Arnason's remark in an MDL deposition in these proceedings: "I can't think of anything in the literature of a chronic polyneuritis being associated with vaccination."[39]

There is, then, a dearth of specific information connecting CIP to vaccination. In the course of the swine flu surveillance conducted by CDC during and after the immunization program, health departments throughout the country were asked to report any vaccine-related illnesses, and CDC conducted an active investigation in search of GBS cases. All practicing neurologists in the nation were contacted, and a wide variety of neurological syndromes were reported to CDC in addition to GBS, including sixteen cases of "peripheral nerve disease."[40] The CDC report does not specify whether any of these cases involved CIP, but it does conclude that none of the neurological syndromes but GBS was reported at a rate higher than anticipated levels.[41]

It may be true, as Dr. Eaton observes, that the degree of vigilance in reporting to CDC was heightened only for GBS cases that followed immunization fairly quickly. Nevertheless, millions of doses of influenza vaccines are administered annually, and there is simply no statistical evidence in the medical literature that such immunizations are associated with CIP. Indeed, no such evidence existed for GBS until the swine flu episode, where statistical correlations for the first time made a causal connection probable. These correlations implicate acute GBS cases arising within weeks of the flu shot, not a delayed, progressive form of inflammatory polyradiculoneuropathy. Moreover, there is not enough known about the etiology or pathogenesis of either GBS or CIP to state with assurance that, by analogy to the GBS cases, swine flu vaccine is a probable cause of CIP.

*Conclusion*

Under California law, which controls here, the plaintiff has the burden of proving proximate cause by a preponderance of the evidence. *See* Cal.Evid.Code §§ 115, 500 (West 1966). Plaintiffs here must prove that, more probably than not, the swine flu inoculation contributed to a condition of CIP suffered by Mr. Adleson—that he would not have suffered CIP but for the swine flu shot.[42]

Dr. Eaton's theory of causation is that the swine flu immunization in December, 1976, initiated a gradually progressive CIP, probably by sensitizing the body's immune system, which later flared up following a viral infection in August, 1977. This theory may be a possible explanation of Mr. Adleson's condition, but the evidence fails to establish the swine flu immunization as a probable cause of his condition. As the testimony of Doctors Burton and Normanly shows, there is no experimental or statistical evidence establishing that an influenza

**38.** Thomas, *et al., supra* note 19, at 591–92.

**39.** Plaintiff's Trial Brief, at 9.

**40.** Retailliau, *et al., supra* note 1, at 12–13.

**41.** *Id.*

**42.** *See, e. g., Valdez v. J. D. Diffenbaugh Co.,* 51 Cal.App.3d 494, 508–09, 124 Cal.Rptr. 467, 476–77 (4th Dist. 1975):

All a plaintiff need show to establish proximate, or legal, cause is that the defendant's negligent act in some way contributed to the injury (e. g., *but for* defendant's negligence the injury would not have occurred).... The plaintiff is not required to establish the fact of causation with absolute certainty. It is sufficient if there is evidence from which reasonable men could conclude that it is more probable that the defendant's conduct was a cause, than that it was not.

(Quoting *Ahrentzen v. Westburg,* 263 Cal. App.2d 749, 751, 69 Cal.Rptr. 916, 918 (2d Dist. 1968).) (Emphasis in original.)

**468**

vaccination can sensitize the immune system so that demyelination occurs gradually, later to be accelerated into an acute attack by a viral infection. Nor is there sufficient medical evidence of the disease process in GBS and CIP to justify an analogy in CIP cases to the association of swine flu immunization with acute GBS attacks shortly following inoculation.

Accordingly the Court finds and concludes that plaintiffs have failed to sustain their burden of proof on the issue of causation. Judgment will be entered for defendant, the parties to bear their own costs.

IT IS SO ORDERED.