**Howard G. BAUM, Executor of the Estate of Towanda M. Baum, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–275.**

United States District Court, M. D. Pennsylvania.

June 29, 1982.

**1350**

George F. Douglas, Jr., Carlisle, Pa., for plaintiff.

Jeffrey Axelrad, Chief, Torts Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., J. Andrew Smyser, Asst. U. S. Atty., Harrisburg, Pa., Thaddeus B. Hodgdon, Torts Branch, Civ. Div., U. S. Justice Dept., Washington, D. C., for defendant.

## MEMORANDUM

HERMAN, District Judge.

### Introduction

This is an action initiated by the Plaintiff, Howard G. Baum, as executor of the estate of his mother, Towanda M. Baum, (hereinafter referred to as "Mrs. Baum"), pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671, *et seq.*, and the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b. Plaintiff alleges that his mother died of complications arising out of Guillain-Barre Syndrome (hereinafter referred to as "GBS"), which she allegedly developed as a result of receiving a swine flu inoculation.

GBS is a neurological disorder of unknown cause that affects the peripheral as opposed to the central nervous system, and results in motor weakness and reflex impairment. Medical studies have revealed a number of different antecedent events that seem to trigger the onset of the disorder, although in one-third to one-half of the cases of GBS there is no ascertainable antecedent event. The swine flu immunization program conducted by the federal government in 1976 triggered a dramatic increase in the number of GBS cases among vaccinees, and the program was suspended in December of 1976 because of the apparent risk of GBS complications.

Plaintiff filed his complaint against the United States of America (hereinafter referred to as "the United States") on March 5, 1979. Pursuant to 28 U.S.C. § 1407, the action was transferred to the United States District Court for the District of Columbia for consolidated multidistrict pretrial proceedings. *Baum v. United States of America*, Civ.No. 79–275 (Jud.Pan.M.D.L. April 5, 1979) (transfer order). ·See *In re Swine Flu Immunization Product Liability Litigation No. 330*, 446 F.Supp. 244 (Jud.Pan.Mult.Lit. 1978). In those proceedings, the United States stipulated that GBS can be caused by the swine flu vaccine in certain instances, and that if, in a particular case, the United States concedes that the plaintiff developed GBS at any time, or, if a court so finds, it would not be necessary for the plaintiff to establish a particular theory of liability. The only liability issue in such a case would be causation. *In re Swine Flu Immunization Products Liability Litigation*, M.D.L. No. 330, Misc.No. 78–0040, slip op. at 9 (D.D.C. Nov. 15, 1979) (final pretrial order).

Upon completion of the multidistrict proceedings, the instant case was remanded to

this court for local discovery and trial. On July 23, 1981, the United States moved to bifurcate the trial as to the issues of liability and damages, as provided for by paragraph IX of the final pretrial order. *In re Swine Flu Immunization Products Liability Litigation*, M.D.L.No. 330, Misc.No. 78–0040 (D.D.C. Nov. 15, 1979). We granted Defendant's motion on August 18, 1981. The issue of liability was tried by the court without a jury from September 21, 1981 to September 24, 1981.

 Defendant in this case did not concede that Mrs. Baum suffered from GBS. Consequently, the issues at trial were two: first, did Mrs. Baum contract GBS; and second, if she did contract the disease, was the swine flu inoculation she received the proximate cause. Pursuant to the Federal Tort Claims Act, the law of the place where the act or omission occurred applies. 28 U.S.C. § 1346(b). In this instance, the law of Pennsylvania applies. Plaintiff, therefore, was required to prove his case on the above-mentioned issues by a preponderance of the evidence. *See Vlases v. Montgomery Ward*, 377 F.2d 846, 851 (3d Cir. 1967) (Pennsylvania law requires a preponderance of evidence in favor of plaintiff's basic proposition, but the trier of fact need not be persuaded beyond a reasonable doubt). The proximate cause of an injury, under current Pennsylvania law, is that cause which was a substantial factor in bringing about the injury. *Hamil v. Bashline*, 392 A.2d 1280, 1284, 481 Pa. 256, 265 (1978).

With the foregoing in mind, and in compliance with Federal Rule of Civil Procedure 52(a), we present the following findings of fact and conclusions of law.

*Findings of Fact*

 The decedent in this case, Towanda M. Baum, was born on June 1, 1911. (Transcript at 48). On July 20, 1975, (Tr. at 92), at age 64, Mrs. Baum was diagnosed as having chronic lymphocytic leukemia (hereinafter referred to as "CLL") (Tr. at 75). CLL is a form of cancer in which hemoglobin (red blood cells) is destroyed by leukemic cells (cancerous cells). By the fall of 1976, Mrs. Baum's CLL was in an advanced state, characterized by severe anemia, a moderate increase in platelets, an enlarged spleen, and a frequent need for blood transfusions to replace the red blood cells destroyed by her malignantly enlarged spleen. (Tr. at 77). Mrs. Baum was receiving biweekly blood transfusions, (Tr. at 93), but the transfusions were not maintaining a satisfactory level of red blood cells. (Tr. at 94). As a result of this loss of hemoglobin and her anemic condition, Mrs. Baum suffered from an undue state of fatigue, shortness of breath and generalized weakness (Tr. at 78, 94 & 97). This easy fatigability and decreased exercise tolerance made the normal activities of daily living, such as climbing stairs, difficult for her. (Tr. at 97).

On October 28, 1976, Dr. Joseph Brazel, the specialist in hematology (blood diseases) and oncology (cancer) who had treated Mrs. Baum since the diagnosis of her disease in July of 1975, administered a swine flu vaccination to Mrs. Baum, in accordance with the instructions issued by the Federal Communicable Disease Center in Atlanta. (Tr. at 76). Several of Mrs. Baum's friends and relatives testified at trial that in the month following her inoculation Mrs. Baum stumbled several times, dropped light items, and complained of foot drop and an inability to grasp objects. (Tr. at 3–5, 32–33, 39–41, 59–61). She began to sleep on the first floor because she was unable to climb the stairs to the second floor unassisted. (Tr. at 20). Around Thanksgiving time, she stopped attending Wednesday evening prayer services, as was her custom, because she could not climb the steps. (Tr. at 24).

Plaintiff contends that this testimony constitutes evidence of early symptoms of GBS, although the disease did not reach its acute phase until several weeks later. A more likely explanation for Mrs. Baum's decreased motor ability, however, is the severe fatigue and weakness brought on by her CLL. Significantly, Dr. Brazel did not recall, and his records contain no reference to, any specific complaints by Mrs. Baum about a foot drop or a difficulty in grasping

during a time when he was seeing her at least monthly. (Tr. at 93, 101).[1] He did report at trial that Mrs. Baum suffered from the generalized weakness, shortness of breath, fatigability and anemia symptomatic of CLL. (Tr. at 78, 101). Dr. Brazel admitted that it was not until February of 1977 that he first felt Mrs. Baum had a neurologic cause of her weakness *other than* the weakness produced by her generalized disability from her CLL and the resulting anemia. Dr. Richard Tenser, an expert in neurology called by the government, indicated that the incidents related by Plaintiff's witnesses were consistent with a generalized weakness from her leukemia. In fact, he testified that the prolonged course of the weakness over several months, from November through February, was more compatible with a diagnosis of leukemic radiculopathy than GBS. (Tr. at 168).

As a result of Mrs. Baum's weakened condition, Dr. Brazel recommended a splenectomy to decrease the need for transfusions and to raise the platelet count. (Tr. at 77, 93). Although the operation did not take place until December 28, 1976, Dr. Brazel testified that he had made the recommendation from two and one-half to three months prior to that date (Tr. at 77, 93–94).

After the splenectomy in December, Mrs. Baum's hemoglobin and platelet count did increase, but she remained in a somewhat weakened state and did not show the level of improvement hoped for. (Tr. at 98–99). In late January of 1977, Mrs. Baum contracted a cold. (Tr. at 127).

On or about February 4, 1977, Mrs. Baum experienced an acute rapidly ascending weakness in her legs and then in her arms, to the point of near total paralysis of all four extremities. (Tr. at 77–78, 99–101). Dr. Brazel was called to her home on February 7, 1977, (Tr. at 78–79), and Mrs. Baum was admitted to the Carlisle Hospital on February 8, 1977. (Tr. at 81). Dr. Brazel's records of his examination of Mrs. Baum at that time describe her condition as one of extreme symmetrical[2] motor weakness involving all four extremities, and a complete absence of reflexes in the extremities. (Tr. 81–82). An electromyogram (EMG), an electrical study of muscle functioning in the extremities, showed that the weakness was due to a disease of the peripheral nerves (peripheral neuropathy), rather than to a disease of the spinal cord (Tr. at 83). A spinal tap revealed no evidence of neoplastic or tumor involvement of the spinal cord, no evidence of infectious causes such as meningitis, and no increase in the protein level of the spinal fluid (Tr. at 83–84).

Plaintiff interprets the rapid progression of paralysis in the first week of February as the onset of GBS in its acute phase. Admittedly, the symptoms exhibited by Mrs. Baum at this time are superficially consistent with criteria generally required for a diagnosis of GBS.[3] Progressive motor weakness of more then one limb and areflexia (loss of reflexes) appear in all cases. The relative symmetry of the paralysis, and abnormal EMG readings are also typical of the disease. *Criteria for Diagnosis of Guillain-Barre Syndrome*, in 3 Annals of Neurology 565 (1978).

Other features of Mrs. Baum's condition, however, do not support a GBS diagnosis. In particular, the progression of her symptoms did not match the classic GBS pattern. Generally, the motor weakness and other symptoms progress rapidly over a period of one to four weeks, reach a plateau, and

---

1. In his answers to Defendant's interrogatories, the Plaintiff stated that the symptoms of decedent's illness were first noticed by her family immediately prior to her hospitalization in February, contrary to the testimony he presented at trial. (Defendant's Exhibit # 24, Interrogatories Nos. 42–43; Tr. at 54–56).

2. The symmetry of the weakness enabled Dr. Brazel to rule out polio, since that disease is characterized by asymmetric motor weakness.

3. Under the present state of medical knowledge, the basis for a GBS diagnosis is descriptive, that is, a confluence of certain clinical, laboratory and electrodiagnostic findings must be present; no one symptom or test conclusively establishes the disease.

then slowly improve two to four weeks later in a recovery that may continue over several months. (Dyck Deposition at 10–12; Arnason Deposition at 21–22); Wiederholt, et al., *The Landry-Guillain-Barre-Strohl Syndrome*, in 39 Mayo Clinic Proceedings 427, 442–43 (1964)) If Mrs. Baum's earlier symptoms of motor weakness, the stumbling and foot drop, are taken into account, then her symptoms persisted over a protracted period, as we have previously noted, rather than progressing in the rapid fashion characteristic of GBS. Even excluding those first incidents of motor impairment, Mrs. Baum's paralysis reached its severest level shortly after her admission to Carlisle Hospital and remained constant with no sign of recovery until her death on June 11, 1977 (Tr. at 86, 112–13). This lack of improvement is also unlike the usual case of GBS. There are, of course, cases in which GBS patients do not recover. Those who do not survive the disease generally die from inadequate respiration brought on by the paralysis, or from infection from being placed on a ventilator, or from cardiac arhythmia. (Tr. at 100–12, 114). Mrs. Baum never lost the ability to breathe and never required artificial ventilation. (Tr. at 109–112). The immediate cause of Mrs. Baum's death was a pulmonary embolism which occurred because of her paralyzed state. (Tr. at 158–59, 165).

Thus, a neuropathy such as Mrs. Baum's, which began and continued in a chronic state, would not ordinarily be diagnosed as GBS. (Dyck Deposition at 12). The existence of a chronic or "smouldering" form of GBS has been recognized as an occasional variant of the disease by some authorities. Arnason, *Inflammatory Polyradiculoneuropathies*, in Peripheral Neuropathy 1110, 1135 (1975) (M.D.L. Doc. # 103); *Criteria for Diagnosis of Guillain-Barre Syndrome*, in 3 Annals of Neurology 565 (1978). See *Adleson v. United States*, 523 F.Supp. 459 (N.D.Cal.1981); *Sanders v. United States of America*, Civ.No. 80–31–N (E.D.Va. July 1, 1981) (bench opinion); *Thompson v. United States of America*, Civ.No. 79–1017–A, slip op. at 6–7 (E.D.Va. Nov. 6, 1980). The scientific support for a slowly developing form of GBS, however, is far from a consensus. Moreover, in this case there is considerable other evidence that conflicts with a finding of GBS. Mrs. Baum experienced significant pain throughout her hospitalization, and persistent bowel and bladder abnormalities, which are symptoms not seen in GBS. (Tr. at 143–144, 195); *Criteria, supra* at 566. She had no cranial nerve involvement, which is atypical in a GBS patient whose limbs are totally paralyzed. (Tr. 195–196); Harrison's Principles of Internal Medicine 1807 (8th ed. 1977) (M.D.L. Doc. # 78). In addition, Dr. Brazel did not find an elevated protein level in Mrs. Baum's cerebrospinal fluid, another confirmatory signal of GBS. Although increased protein generally does not appear until after the first week following the onset of clinical symptoms, (Tr. at 84); *Criteria, supra* at 566, the protein level reaches its peak after about four to six weeks. *Inflammatory Polyradiculoneuropathies, supra* at 1123. If Mrs. Baum's muscular weakness in November and December was the first sign of GBS, as Plaintiff contends, she would certainly have had increased protein readings by the first week of February. Finally, the consulting neurologist on Mrs. Baum's case, Dr. Richard Somma, the pathologist who performed the autopsy, Dr. Duck-Kyu Chang, and the government expert in neurology who reviewed Mrs. Baum's medical records, Dr. Richard Tenser, all disagreed with Dr. Brazel's diagnosis of GBS.

The most persuasive evidence against a finding of GBS is the autopsy report by Dr. Duck-Kyu Chang (Def.Exh. # 1). He found leukemic infiltration into the nerve roots, similar to the infiltration of leukemic cells throughout every organ in her body. (Tr. at 171, 174–75). He did not report any evidence of demyelization (loss of the sheath around the nerve), death of the axon (central core of the nerve fiber), infiltration of nerve fibers by non-leukemic lymphocytes, or accumulation of fluid within the nerve bundles. These findings would be present in a GBS patient (Tr. at 173). Consequently, Dr. Chang concluded that Mrs. Baum's peripheral neuropathy was due to leukemic infiltration into the nerve roots, and not to GBS. (Tr. at 172).

Although Dr. Chang is not a neurologist, he has been trained in the pathology of GBS, a requirement for certification as a pathologist. (Tr. at 171). Dr. Tenser and Dr. Somma, however, are both specialists in neurology. Each had seen approximately thirty-five (35) GBS patients in his career.[4] (Tr. at 141, 199). After reviewing the medical evidence, including Dr. Chang's autopsy report, they independently formed the same opinion: Mrs. Baum's paralysis was caused by the leukemic infiltration of the nerve roots associated with her CLL (Tr. at 142, 158–59, 193–94).[5] Although not common, (Tr. at 162), a severe peripheral neuropathy as a complication of CLL is not unheard of. (Tr. at 149–150); McLeod & Walsh, *Peripheral Neuropathy Associated with Lymphomas and Other Reticuloses,* in Peripheral Neuropathy 1314, 1323 (1975).

We must give considerable credence to the opinion and testimony of Dr. Brazel, who adamantly defended his diagnosis of GBS. As the attending physician, he had the best opportunity to evaluate Mrs. Baum's symptoms. Nevertheless, taking all of the evidence together, we can only conclude that the more likely explanation of Mrs. Baum's paralyzed condition, which ultimately led to her death, is that espoused by the three physicians who testified for the government at trial. Plaintiff has not persuaded us that Mrs. Baum suffered from GBS rather than from a complication of her CLL.

Even assuming that Mrs. Baum did have GBS, the evidence does not support a finding that the disease was caused by the swine flu inoculation on October 28, 1976. We have previously examined the evidence Plaintiff presented to establish the first ap-pearance of symptoms as sometime in November and found it wanting. In addition, accepting for purposes of argument that increased protein did not appear in Mrs. Baum's spinal tap because it was still too early in the progression of the disease, the negative test results would place the initial onset of Mrs. Baum's GBS in February, approximately fourteen (14) weeks after her swine flu inoculation in October. This lengthy lapse of time between the inoculation and the outbreak of the disease makes any causal connection extremely tenuous, at best. Most experts agree, based upon clinical experience, medical research and epidemiological studies, that the statistical correlation between GBS and a swine flu shot as a triggering event ends after a maximum of approximately ten (10) weeks. (Dyck Deposition at 36–38, Arnason Dep. at 51–52, 54; Langmuir Dep. at 71–72, Nathanson Dep. at 35–36; Wehrle Dep. at 55–56; Schonberger Dep. at 95–102). The Plaintiff attempts to make much out of the fact that Dr. Alexander Langmuir, in a study of the GBS-swine flu vaccine relationship, extended his graph of the number of cases reported in weeks following inoculation to the 16th week. Langmuir, *The Swine Influenza Virus Vaccine-Guillain Barre Incident in the United States,* Fig. 7, Symposium on Guillain-Barre Syndrome, Royal Society of Medicine (London, April 11, 1978) (M.D.L. Doc. # 110). Dr. Langmuir testified in his deposition, however, that

> [f]rom my study, I cannot conclude, . . . that any of the cases occurring after the tenth week were related to the vaccine. In fact, I seriously doubt that they were.

(Tr. at 232).

Furthermore, other likely "triggering" events occurred closer in time to the alleged

---

4. Dr. Brazel, in contrast, had not treated a single GBS patient prior to his diagnosis of Mrs. Baum's condition as GBS. (Tr. at 132–33).

5. At the time of his initial examination of Mrs. Baum in February of 1977, Dr. Somma concluded that she had a peripheral neuropathy, due either to her CLL or to GBS. He leaned toward the CLL, however, because the current theory regarding GBS holds that the body's natural immunization system is triggered in some man-ner to produce antibodies and activated immune cells which attack the myelin sheath around the nerves. The medication that Mrs. Baum was taking for her CLL would have caused an immunosuppressed state such that her system could not produce these antibodies and immune cells. (Tr. at 188–190, 199–202). Data taken after Dr. Somma's examination and the autopsy findings supported his original impression. (Tr. at 193–196).

onset of GBS than Mrs. Baum's vaccination. The operation to remove her spleen took place approximately five weeks before the February attack. She had a cold just one week prior to the initial appearance of symptoms. Upper respiratory infections are the most common antecedent event associated with GBS, occurring in about fifty percent of the cases. (Tr. 126–127, 155–156, 190–191). Surgical operations have been causally associated with GBS in about five percent of the cases (Tr. at 155, 190–91). Both Dr. Tenser and Dr. Somma testified that if Mrs. Baum did have GBS, the most likely cause was her cold or the splenectomy. (Tr. at 156, 196–97). Although Dr. Brazel disputes the ten-week cut-off point and insists that the fourteen-week interval is not too great to find a causal relationship between Mrs. Baum's GBS and her swine flu vaccination, (Tr. at 91, 126), once again, his is the lone voice in support of Plaintiff's contention. Recalling that his specialty is blood and cancer diseases rather than neurology, and that he had little clinical experience with GBS, we cannot accept his testimony on causation over that of other more qualified witnesses.

### Conclusions of Law

Based upon the foregoing findings of fact, therefore, we hold that Plaintiff did not meet his burden of proof. He did not show by a preponderance of the evidence either that the decedent in this case, Towanda M. Baum, contracted Guillain-Barre Syndrome, or, if she suffered from the disease, that the swine flu inoculation was the proximate cause of Mrs. Baum's Guillain-Barre Syndrome and her resulting death.

Judgment shall be entered in favor of the Defendant.