**John BEALL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 80–1030.**

United States District Court, M.D. Pennsylvania.

June 13, 1983.

Mark P. Friedlander, Jr., Friedlander, Friedlander & Brooks, P.C., Arlington, Va., John P. Hohenadel, and Judith L. White, Nikolaus, Hohenadel & Chesters, Lancaster, Pa., for plaintiff.

David Dart Queen, U.S. Atty., Harry A. Nagle, Asst. U.S. Atty., Lewisburg, Pa., for defendant.

MEMORANDUM

CALDWELL, District Judge.

The plaintiff, John Beall, has brought suit against the United States alleging that he developed Guillain-Barre Syndrome (GBS) as a result of his participation in the government-sponsored swine flue inoculation program. The plaintiff filed his complaint on September 18, 1980. The action was transferred to the United States District Court for the District of Columbia for multidistrict pre-trial proceedings and was returned to this district by order of June 4, 1981. Pursuant to an unopposed defense motion this case was bifurcated for trial by order of March 9, 1983. Trial on the issue of liability commenced on May 23, 1983, and

concluded on May 26, 1983. In the final multidistrict pre-trial order entered on November 15, 1979, the government agreed that, if it did not contest the diagnosis of GBS or if the court should find that a plaintiff had GBS, then no theory of liability need be proven (paragraph IX). In this case, the diagnosis is contested, and hence the issues at trial are two: did the plaintiff contract GBS, and if so, was the GBS caused by the swine flu vaccine. In accordance with the Federal Tort Claims Act, the law of the place where the act or omission occurred applies. 28 U.S.C. § 1346(b). Consequently, the law of Pennsylvania applies, and plaintiff must prove his case on both issues by a preponderance of the evidence. *See Vlases v. Montgomery Ward,* 377 F.2d 846, 851 (3d Cir.1967); *Baum v. United States,* 541 F.Supp. 1349, 1351 (M.D. Pa.1982). Similarly, the proximate cause of an injury is that cause which was a substantial factor in bringing it about. *See Baum; Hamil v. Bashline,* 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978).

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, we now make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The plaintiff, a 66 year old man, received the swine flu vaccine on November 23, 1976, in York, Pennsylvania. He was first admitted to Columbia Hospital on February 20, 1977. At the time of admission, the plaintiff related a history of recent muscular soreness and weakness as well as diarrhea and gastro-intestinal distress. None of the symptoms described caused him to ·miss work prior to his hospital admission. The plaintiff's condition worsened to the point where he was unable to get out of bed under his own power. He gradually recovered to the extent that he can now get around with the aid of crutches. Plaintiff alleges ·that his ailment is GBS, brought about by his swine flu inoculation.

GBS is a disorder of the peripheral nervous system caused by the dysfunction of an individual's own immune system. The immune system is "perturbed" by some triggering event and attacks the myelin sheathing of the peripheral nerves. This demyelinization results in a variety of symptoms including symmetrical and progressive muscular weakness which begins with the lower extremities and moves up the body to involve the arms and sometimes the muscles of the trunk and face. Numbness or prickling sensations may be experienced by the patient. The syndrome is normally marked by an absence of deep tendon reflexes, elevated protein in cerebrospinal fluid, and can be further corroborated by electrodiagnostic test results evidencing slowing or blockage of nerve conduction. Severity of the disorder differs widely and, although most patients recover functionally, some die, and some recover only partially.

The exact pathogenesis of the syndrome is unknown, although it is known that inoculations can trigger the disorder in certain individuals. Specifically, increased incidence of GBS has been linked to the Pasteur rabies vaccine and to the swine flu vaccine. Approximately two-thirds of GBS victims have reported an antecedent upper respiratory viral illness, while one-third have reported a preceding viral illness in the gastro-intestinal tract. Dr. Richard Tenser has testified that the viral precursor may be quite minor and may in fact go unnoticed and unreported by the patient. GBS can also be caused by trauma or surgery and, in some cases, there is no apparent cause at all.

With respect to the swine flu vaccine, opinions differ as to the length of time following inoculation for which the risk of contracting GBS is significantly increased. We find by the weight of the most credible medical testimony adduced that the administration of swine flu vaccine results in an increased risk of GBS only through the tenth week following injection. Further, the statistical peak for correlation between injection and GBS is reached somewhere between the third and fifth week. Thereafter, the probability of correlation declines through the eighth to tenth week, after which it is not statistically significant.

We cannot say that a diagnosis of GBS in plaintiff's case is free from doubt. Doctors Hernandez and Barr, two of plaintiff's treating physicians, testified at trial to this diagnosis, as did Dr. Poser, an expert retained for the purposes of litigation. Consistent with GBS is Mr. Beall's progressive bilateral and absence of significant sensory loss. Also indicative of GBS are the electrodiagnostic tests and the elevated spinal fluid protein. However, both Doctors Tenser and Pleasure testified to confusion over the retained deep tendon reflexes which, they stated are not at all typical of GBS. Dr. Pleasure, who testified that he has seen many cases of GBS said that he has never seen a GBS patient with retained deep tendon reflexes after the syndrome's onset. Dr. Barr, however, noted the presence of normal deep tendon reflexes in the plaintiff as late as his discharge from Lancaster General Hospital on March 30, 1977. This led Dr. Pleasure to describe his "confusion" in the diagnosis of plaintiff's condition, which he described as a peripheral neuropathy resembling GBS with one irreconcilable feature—retained deep tendon reflexes. In a letter to defense counsel dated December 21, 1982, (Defendant's exhibit 13) Dr. Pleasure concluded "Based on my review of the documents you forwarded to me, I think it is likely that Mr. Beall did have the Guillain-Barre Syndrome, but I can't state this with reasonable medical certainty." Dr. Tenser, in a similar letter dated December 1, 1982, (Defendant's exhibit 15) was somewhat more emphatic stating that "while it is probable that Mr. Beall suffered from a polyneuropathy, I would be reluctant to put it in the category of the Guillain-Barre Syndrome." At trial, Dr. Tenser said that Mr. Beall had a polyridiculopathy, possibly GBS, but not a typical case. Dr. Poser, on the other hand, testified on direct examination that to him it appeared that Mr. Beall manifested a "classical" case of GBS. On cross-examination, however, he admitted that Mr. Beall's case was an exception to the general rule that GBS involves an absence of deep tendon reflexes. We have grave doubts that the plaintiff has satisfied his burden of proving that his disorder is GBS, but need not resolve these doubts, because of our finding on the issue of causation which will be considered next.

Were we to find that plaintiff suffered from GBS, in order to enter a verdict in his favor, we would still, of course, have to find the swine flu vaccine the proximate cause of his condition. Critical to this determination is the date of onset of Mr. Beall's neurological symptoms. Pinpointing the date of onset is difficult because of conflicting accounts. At trial, the plaintiff testified that he first noticed muscular weakness early in February, 1977, although he did not seek professional help until admission to the Columbia Hospital on February 20, 1977. He also related several incidents in December involving weakness in the hands and arms (e.g. wobbly signature and difficulties in operating a glass cutter) which he apparently did not recall or to which he did not attach any importance until recently. Because of the passage of time, we believe the chronology of events is most accurately reflected in the physician's reports made at the approximate time of onset. Even here there is some conflict, although it seems fairly clear that plaintiff did not describe his perceived muscular weakness as beginning more than a few days prior to admission to the Columbia Hospital. The Columbia Hospital admission record dated February 20, 1977 states, for example "Pt. woke up this a.m. a little strength in both legs. Was o.k. yesterday walking. Pt. states after he stands up he can walk some, but difficulty in standing." (Plaintiff's exhibit 1) The attached history, completed the same date by Dr. Hernandez states:

> This 60 year old man was admitted via the E.R. because of pain in the legs, and hypertension. The patient had not seen a physician for a period of about ten years. He had apparently enjoyed good health all the time up until three to four days prior to this admission, when he suddenly developed generalized abdominal pain associated with diarrhea. He averaged four to five bowel movements daily, which were loose, but not all watery.

Since that time he had some weakness, particularly noticeable in the legs.

Similarly, in a report dated March 8, 1977, describing a consultation of the same day, Dr. William Myers noted that "This 60 year old male who is a craftsman at Allis Chalmers in York was transferred from the Columbia Hospital on 3–1–77. He had been admitted there on approximately 2–24–77 because of onset of weakness. He tells me that he had had what he calls a viral infection with apparent gastroenteritis and some diarrhea." (Plaintiff's exhibit 2). In a report dated March 11, 1977, describing a consultation the preceding day, Dr. Myers noted simply, "This 60 year-old male had the onset 18 days ago of generalized weakness following a viral infection." (Plaintiff's exhibit 2). Finally, in a report dated March 23, 1977, Dr. Barr related that the plaintiff "gave a two week history of a viral illness followed by a five day history of soreness and weakness in his legs and some incoordination." (Plaintiff's exhibit 2).

Although there is some confusion over the precise chronology, the above-cited reports indicate that the weakness related by the plaintiff began shortly before his admission to Columbia Hospital on February 20, 1977, and followed a gastro-intestinal disorder of some uncertain duration. We find, on the basis of the weight of the credible evidence presented that Mr. Beall's neurological disorder was probably not caused by the swine flu vaccine. We draw this conclusion because we find that the plaintiff's symptoms of weakness post-dated his inoculation by approximately twelve weeks, and thus at a time when any "excess risk" caused by the vaccine had ceased to exist. Further, because of the presence of the antecedent gastro-intestinal or viral illness, a far more likely cause of the disorder exists. As noted previously, gastro-intestinal viruses, even mild in nature, are known precursors of GBS in about one third of reported cases. Given the relative temporal proximity between the injection and viral illness and the onset of the neurological symptoms, both Doctors Tenser and Pleasure have testified that if Mr. Beall had GBS, it was far more likely triggered by his antecedent gastro-intestinal disorder than by his injection with the swine flu vaccine. We find their testimony more credible than that offered by the plaintiff's experts.

CONCLUSIONS OF LAW

Based on the foregoing findings of fact, we conclude that plaintiff has not met his burden of proving by a preponderance of the evidence that he contracted Guillain-Barre Syndrome as a result of the swine flu vaccine administered to him on November 23, 1976.

Judgment shall be entered in favor of the defendant.