**Annie M. BARNES, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 78–64–S.

United States District Court,
M. D. Alabama, S. D.

Oct. 29, 1981.

Hare, Wynn, Newell & Newton, R. Gordon Pate, Birmingham, Ala., and Cunningham, Bounds, Byrd, Yance & Crowder, Mobile, Ala., for plaintiff.

Frank W. Donaldson, U. S. Atty., Susan B. Bevill and Kenneth E. Vines, Asst. U. S. Attys., Montgomery, Ala., Barbara Allen Babcock, Asst. Atty. Gen., Jeffrey Axelrad, Director, Torts Branch, and Leon B. Taranto, Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiff, Mrs. Annie Barnes, brings this action alleging that she contracted Guillain-Barre Syndrome (GBS) as the result of receiving a swine flu vaccination. Jurisdiction is vested in this Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671 et seq., and the National Swine Flu Immunization Program Act of 1976, 42 U.S.C. § 247b et seq. Upon consideration of the evidence presented at trial, briefs and argument of counsel, the Court holds that plaintiff did contract GBS which was caused by the swine flu vaccine and the Court assesses damages against defendant in the sum of $40,000.00.

## I. LIABILITY

The parties are agreed that on November 2, 1976, plaintiff was inoculated with the swine flu vaccine and subsequently contracted GBS. The Government stipulated that a plaintiff who develops GBS as the result of the swine flu shot need not present a theory of liability to recover damages. Although admitting a duty to pay damages to plaintiff if her GBS was caused by the shot, the Government denies that the inoculation caused plaintiff's GBS. Thus, the liability issue in this case concerns solely a question of causation.[1]

GBS is a neurological disorder. The most significant characteristics of GBS are bilateral motor weakness and loss of tendon reflexes. The degree of weakness ranges from minimal weakness of the legs to total paralysis of the muscles of the arms and legs and may involve respiratory or facial muscles.

It usually progresses over a period of weeks with approximately 90 per cent of the cases reaching the maximum progression by the end of four weeks. In the usual case, patients then begin a gradual recovery. Approximately 85 to 90 per cent of those persons afflicted with GBS totally recover; however, a few individuals are left with some residual deficit, usually in the lower extremities. Mrs. Barnes was left with some such a residual.

The exact cause of GBS is unknown. It has been temporally associated with many antecedent events including immunizations. The defendant concedes that statistically a higher percentage of persons develop GBS after inoculation with the swine flu shot than otherwise. Among the many other statistically significant antecedent events are upper respiratory infections, dog bites, and malignant diseases. In approximately half of the cases, there is no identifiable antecedent event.

Most expert opinion believes that a substance attacks the myelin sheath which surrounds certain of the nerves in the body. The nerves' ability to conduct electrical impulses from the brain to the muscles is thereby impaired until the myelin regenerates. In theory, the duration of the loss of

---

1. 28 U.S.C. § 1346(b) provides that liability is determined "in accordance with the law of the place where the act or omission occurred." Thus, Alabama law as it relates to causation will be applied by the Court.

motor function depends on the extent of demyelinization and the period required for regeneration.

■ Neither the plaintiff, the learned doctors, nor the Court can say absolutely that the GBS suffered by Mrs. Barnes was caused by the swine flu shot. The following facts, however, cause the Court to conclude that more probably than not Mrs. Barnes' GBS disease was caused by the swine flu shot.

At the time she took the shot, Mrs. Barnes was seventy-four years of age. She was an unusually active, independent and contributing member of her community. For example, she kept up a garden which had over 500 feet of paved paths. This would be a task beyond the physical ability of most people many years her junior. She was active in her church, teaching Sunday school and being otherwise active in the youth work of the church.

She took the swine flu shot on November 2, 1976. Her history of her development of GBS is understandably somewhat confused, particularly as to the precise time that she first noted the symptoms of GBS such as weakness in her legs and arms. She testified that immediately following the vaccination, her arm was swollen and she had a fever. A few days or weeks later, she testified, her feet began to tingle and she had numbness in her legs. She recalls vividly the occasion in early December, 1976, when she was at the church working on the setting up of the nativity display. She told a co-worker that she was afraid to pick up a nativity piece for fear of dropping it. Thereafter, her condition worsened. In early 1977, she could not pick up her foot. The evidence while unclear as to the exact time when plaintiff began experiencing the earliest symptoms of GBS established that the symptoms began within the highly suspect period of two to five weeks after the shot.

On October 17, 1977, at the instance of her grandson, she was examined by Dr. Jerome Walker, a neurologist in Decatur, Georgia. For the first time, someone diagnosed Mrs. Barnes' problem as GBS. Dr. Walker expressed the opinion, based on the history given him by Mrs. Barnes, that she had GBS and that it was caused by the swine flu shot.

In support of its contention that the swine flu shot did not cause Mrs. Barnes' GBS, the Government relies on the testimony of Dr. Norman Holman, who was Mrs. Barnes' treating physician for many years prior to the diagnosis of her condition as GBS by Dr. Walker.

Dr. Holman had been Mrs. Barnes' physician for approximately fifteen years. He testified that he had received complaints from her over a period of years of aches and pains and muscle weakness, exhibiting the symptoms of neuritis prior to the time his staff administered to her a swine flu shot. Dr. Holman testified that he saw plaintiff on November 22, 1976, three weeks after her shot, when she came to his office for a blood sugar and cholesterol test. She sought no treatment for a cold and there is no evidence that she received any treatment for a cold.

Dr. Holman testified that the first time Mrs. Barnes complained to him of an inability to walk was on a visit to his office on January 6, 1977. He saw her at his office again on April 5, 1977 at which time she was complaining of cramps in her legs and hands and of a twitching of her legs when she was in bed. He testified that she complained of arthritis in her shoulders and legs in September, 1977. He saw her for the last time on September 30, 1977, prior to her visit to Dr. Walker. At that time she stated that her legs were much improved; that she could pick them up; that the foot cramps she had experienced the previous winter were gone.

The Government contends that the more logical cause of GBS for Mrs. Barnes was the "cold" to which Dr. Holman referred. It is a fact that upper respiratory infection is a recognized antecedent cause of GBS. The Government relies on the deposition testimony of highly qualified medical experts to the effect that if one had a swine flu shot, three weeks later had an upper

respiratory infection, and two weeks thereafter manifested the symptoms of GBS that they would regard the respiratory infection as the more probable cause of GBS because of its closer proximity in time to the GBS. The Government argues, therefore, that since "the cold" was noted about two weeks before the incident with the nativity scene that it is the more likely cause of Mrs. Barnes' GBS. The Court is impressed, however, that evidence of the cold is vague at best. The doctor's records made no mention of a cold. She was not treated for a cold, and the time that Mrs. Barnes' first symptoms of GBS appeared are not established as being as late as the time of the work on the nativity scene. Her testimony was somewhat confused, but she said the symptoms began coming on two to three weeks after the shot, and the Court views the incident with the nativity scene as merely a time when the extent of her muscle weakness is fixed in her memory. The Court does not believe that Dr. Holman's recollection of an unremarkable comment approximately five years previously about "a little cold" should now be the basis of a finding by the Court that Mrs. Barnes had such a respiratory infection as caused her GBS; particularly, when Dr. Holman's office notes make no mention of a cold, and when referring to other visits of Mrs. Barnes, of a later date and of a more serious nature, he understandably said he had no recall other than what was in his notes. Accordingly, the Court holds that plaintiff's GBS was caused by the swine flu shot.

## II. DAMAGES

Since the Court holds that the evidence supports plaintiff's claim that the shot caused her GBS, the only remaining issue is the amount of her damages.

Plaintiff contends that the evidence is clear "that as a result of the Swine Flu Shot she has become 100 per cent totally and permanently disabled and will spend the remaining years of her life confined to a wheelchair." Plaintiff argues, therefore, that the obligation of the Court is to determine what reasonable amount is required to compensate plaintiff for the twelve and a half years of her life expectancy beyond the date of her flu shot that she will be so confined.

Plaintiff relies on the medical testimony of Dr. Walker and Dr. Greene for her contention that the shot caused the wheelchair confinement. But neither doctor so testified. At the time Dr. Walker saw Mrs. Barnes in October, 1977, nearly a year after the shot, the GBS had subsided. Mrs. Barnes walked without the aid of a cane. She and her son gave a history of great improvement in the months following the onset of the GBS. She reported that at one time she had great difficulty getting up and down, but this was much improved. Dr. Holman testified that Mrs. Barnes complained of an inability to walk in January, 1977, but his notes indicate that she advised him also that she was much improved prior to her visit with Dr. Walker.

Dr. Walker testified that one suffering with GBS usually has the weakness come on over a period of one or two weeks. Then "the patient stabilizes and remains the same, usually for several weeks. And then very slowly starts to improve." In many cases the patient is confined to a hospital during the several weeks that the illness is most virulent. Mrs. Barnes was not confined to a hospital, nor was she treated for her illness by any doctor. Dr. Walker testified that although patients often recover completely, he felt that Mrs. Barnes had a residual weakness of a foot drop which made walking more difficult, and since Dr. Greene also noted this residual weakness four years after the shot, he believed the residual was permanent.

Dr. Greene testified GBS is an illness which usually "progresses over a period of weeks with 90 per cent of people having reached their maximum progression by four weeks, and then they have gradual recovery. In certain series, it is as high as 85 to 90 per cent of the people make a total recovery over a period of weeks to months." In Dr. Greene's opinion, Mrs. Barnes was one of those who did not make a complete recovery and the residue of her illness was

permanent. The residual to which he referred, however, was a foot drop, not the condition which confined her to a wheel chair. He noted that a foot drop rarely leads to a person being unable to walk. He stated that in his opinion her greater difficulty in walking from the time of her examination by Dr. Walker—when she was walking without the aid of a cane—to the time of his examination was attributable to other factors. Some of these other factors, which he identified were a progression of her degenerative arthritic condition, a weakness in her thighs and the aging process in that she was three years older when examined by Dr. Greene. Dr. Greene found significant degenerative disease of the lumbar spine with evidence of radiculopathy. He expressed the opinion that Mrs. Barnes' spinal defects in the lumbar area were more probably the result of the aging process than from falls. He noted that arthritis and degeneration of the spine, disc disease,[2] are usually progressive conditions and they can cause confining leg and back pain.

Dr. Schottland, a neurologist, who is presently an assistant professor of neurology at the University of Alabama Medical School in Birmingham, has treated approximately two hundred patients suffering with GBS. He agreed with Dr. Walker and Dr. Greene that Mrs. Barnes had GBS. He also agreed that the foot drop described by Dr. Walker and Dr. Greene was a residual from the GBS and the condition for Mrs. Barnes was most probably permanent since it was noted more than two years after the onset of the GBS. Dr. Schottland was firmly of the opinion that the decline in Mrs. Barnes' condition after the time she was seen by Dr. Walker was not attributable to GBS.

Dr. Caffey, who undertook to treat Mrs. Barnes as her local physician, after her return from her examination by Dr. Walker in October 1977, testified that plaintiff was able to walk with the foot drop until she experienced a fall in June 1979, almost three years after the swine flu shot. Dr. Caffey was of the opinion that plaintiff's foot drop and muscle weakness were contributing causes to her fall. Mrs. Barnes was able to walk with the aid of a walker following her fall, but she gradually became disabled to the point of confinement in a wheelchair.

The Government argues that since the doctors are in agreement that her neurological condition had stabilized by October 1977 insofar as anything attributable to the GBS, the decline thereafter was from those other factors noted by Dr. Greene and Dr. Schottland. Mrs. Barnes testified that she was forced to cease her church activities and use a walker in 1978. This was prior to her fall and months after she had made a recovery from the most disabling period directly related to the GBS. Dr. Schottland pointed out that it would be most atypical for one afflicted with GBS to become disabled, have a substantial recovery, and then regress. Where such regression occurs, it was his opinion that it would be due to other causes than GBS. As noted, he and Dr. Greene thought such other causes were aging, arthritis, osteoporosis, disc compression and discontinuance of an exercise program.

Plaintiff seeks no recovery for any special damages, such as hospitalization or medical treatment. She seeks damages solely for pain, suffering, and the degree of disability she experienced and is continuing to experience as the result of GBS. Although the Court does not agree that GBS has caused this remarkable lady's confinement to a wheelchair, she does have a disabling, permanent foot drop as the result of GBS. It is logical that the foot drop for one of her age has lessened her activity and speeded up the aging process, even though it has not caused the arthritis and spinal problems from which she suffers.

It is at times such as these that a court longs for the collective wisdom of a jury. Setting the amount of damages is no science, and judges have no special tools for measuring what sum will reasonably compensate one in the position of Mrs. Barnes. If Mrs. Barnes had had a complete recovery

---

**2.** Dr. Miles, a neurosurgeon, examined Mrs. Barnes and found evidence of a right disc compression at C–3, C–4, and osteoporosis of the spine.

within the year of her contracting GBS with no hospitalization or medical treatment, no loss of earnings, and only the weakness and temporary and partial loss of use of her legs for this time, this Court would think a recovery of $6,000 to $10,000 would be reasonable. This Court has found, however, that her foot drop is permanent. This condition contributes to some extent to her overall disability. Accordingly, the Court assesses plaintiff's damages at $40,000.00.

A judgment will be entered in accordance with this opinion.