**Madolene SPENCER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 79-6024-CV-SJ.**

United States District Court, W.D. Missouri, St. Joseph Division.

June 21, 1983.

Clifford J. Shoemaker, Vienna, Va., John C. Risjord, Risjord & Curtis, Kansas City, Mo., Robert F. Sevier, Sevier & Burnett, Liberty, Mo., for plaintiff.

Leon B. Taranto, Trial Atty., Torts Div., U.S. Dept. of Justice, Washington, D.C., Judith M. Strong, Kansas City, Mo., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DIRECTING ENTRY OF JUDGMENT

SACHS, District Judge.

This is a civil action brought against the United States pursuant to the National

Swine Flu Immunization Program Act, 42 U.S.C. § 247(b), and the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* The plaintiff, Madolene Spencer, is the widow of Charles A. Spencer. She seeks damages from the defendant for the wrongful death of her husband. She alleges that she incurred considerable medical and other expenses on behalf of her husband and that she was totally dependent on her husband for support. A claim for loss of companionship is implicit in her complaint.

Charles Spencer received the swine flu vaccination on November 2, 1976. He was then 55 years old. He subsequently developed Guillain-Barre Syndrome. The plaintiff alleges that Mr. Spencer's Guillain-Barre Syndrome was a consequence of his swine flu vaccination. The United States denies the allegation that there was any causal relationship between the swine flu inoculation in 1976 and Mr. Spencer's GBS, which the parties agree was in an acute stage in March, 1978, immediately prior to Spencer's death on April 30, 1978.

This case was initially transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Thereafter, it was remanded to this Court for further proceedings and trial. The Final Pretrial Order from the transferee Court provides that where the plaintiff developed GBS at any time after receiving his swine flu vaccination (as is the situation in this case), no theory of liability need be established by the plaintiff in order to recover damages. However, to be entitled to damages, the plaintiff here must prove by a preponderance of the evidence that the swine flu vaccination Mr. Spencer received was more likely than not the cause of the GBS which he later contracted.

■ As will be shown, the Court believes that plaintiff has carried her burden of proof, and has established liability. The Court concludes that shortly after the inoculation, and within the year 1976, Mr. Spencer developed symptoms of what has subsequently been diagnosed as a mild, "smoldering" case of GBS. The illness progressed in a generally mild form, with improvements and worsening of symptoms. An upper respiratory infection in March, 1978, reacted with the smoldering illness in a manner which caused the disease to flare into its classic, acute stage. The Court's findings of early onset are primarily based on credible and uncontested testimony from Mr. Spencer's daughter and stepdaughter. The medical diagnosis of a comparatively rare phenomenon is based on the testimony of Dr. Charles M. Poser, and supportive medical literature, not adequately met by the government.

Prior to receiving the swine flu vaccination on November 2, 1976, Charles Spencer was an energetic, physically active, outgoing person. He married Mrs. Spencer on January 1, 1947, and they had raised four children. Since March of 1955, he had been working for Transworld Airlines, and at the time he received his vaccination, he was a mechanic in the plasma plating shop. Mr. and Mrs. Spencer camped many weekends, generally with their daughter Debbi, and were quite active with camping clubs. Their vacations usually involved extended camping trips. Mr. Spencer was also an avid bowler.

Approximately one week after Mr. Spencer was inoculated for swine flu, he complained of headaches to his daughter, Debbi Templeton, over the breakfast table one morning, and she suggested that he see a doctor, but Mr. Spencer did not follow up. About two weeks after the inoculation he repeatedly complained to Debbi of his left arm being "dead" and tingling, and of leg cramps. He would make a fist with his hand, and alternately shook both legs, complaining of cramps.

Around Thanksgiving or Christmas of 1976, according to a stepdaughter, Sharon Chapman, Mr. Spencer began experiencing problems with aching and cramping of his legs and a numb feeling in his hands and arms. He complained he was cold. He rubbed his left hand and stamped his feet, mainly his left foot. He also began experi-

encing severe headaches. Debbi remembers her father reporting that one side of his face was numb, and he had a twitching. These symptoms went on for weeks until his wife convinced him to see the family doctor, Dr. Hayes, in February of 1977. Dr. Hayes' office records of February 25, 1977, indicate that Mr. Spencer came to his office with a complaint of numbness of the left side of his face of two weeks' duration.

After seeing Dr. Hayes, Mr. Spencer continued having difficulty with his legs and his arms and hands. In March of 1977, his wife noticed that while they were camping at Wallace State Park, he seemed weaker than usual and had to stop and rest several times while they were walking around a flat area in the park. Thereafter, he continued having numbness in his hands, arms, legs and feet, and his wife described how he would stamp his feet and shake his hands and flex his muscles and move his fingers to try to get the feeling back in them. His headaches also continued. He indicated to his wife that pain pills deadened the pain somewhat but that the headaches never left him and were constant.

According to a co-employee, Mr. Foster, in the spring of 1977, Mr. Spencer changed in personality, continued to complain of numbness in the head, a constant runny nose, and headaches. His stamina declined and he appeared jovial one minute, lethargic the next. According to Mr. Foster, Mr. Spencer uncharacteristically lost his enthusiasm and had no motivation. According to his son, Durl, Mr. Spencer was more tired in the fall of 1977, had persistent headaches, did not have good control of his limbs and would rub his head and shake his hands and legs as if they were asleep. His color appeared to have changed and he lost his normal agility. He complained to his son Charles that he had numbness in the fingers. At this time, he complained to his daughters of always being cold and he would unexpectedly drop off to sleep.

By Christmas of 1977, Mr. Spencer's condition remained unchanged. Despite the difficulty he was having, he continued to work. At Thanksgiving of 1977, his wife

noticed that he got exceedingly tired. Between Christmas of 1977 and March of 1978, Mr. Spencer continued having numbness in his hands and arms, feet and legs. His headaches continued. By the end of March, his wife recalls that the palms of his hands and the tips of his fingers and the soles of his feet and his toes were completely numb. Mr. Spencer was feeling less and less well. On Thursday night, March 30, 1978, he came home from work feeling very badly. The palms of his hands and his fingers were dead and so were the soles of his feet and his toes. Nevertheless, he did not feel he could let down the other members of his bowling team, so he went bowling, but bowled very poorly. The next day, his arms had stiffened up and he was not at all well. His wife had been treating him for a cold for approximately a week at that time. That night, a Friday night, he again tried to go bowling with his league. He was barely able to roll the ball down the alley, couldn't move his arms normally, and came home quite concerned. He went to bed but was unable to sleep, and his wife recalls spending most of the night rubbing his legs and arms and trying to help him get some rest. He finally slept from 3:00 a.m. until 6:00 a.m. when he had to go to the bathroom. His wife was able to get him into the bathroom but then couldn't get him back to bed. She called two of her sons who lived nearby and they came and took their father to Spelman Hospital where he was admitted to the emergency room.

Upon his admission to the hospital, Mr. Spencer was extremely sick, and the diagnosis of Guillain-Barre Syndrome was made very quickly. The admitting doctors were not concerned with taking an extensive history concerning the details of the past months, but rather they were concerned with treating the very acutely ill patient. Mrs. Spencer remembers the doctor in the emergency room examining her husband and coming out very shortly to tell her that Mr. Spencer had Guillain-Barre Syndrome. When she indicated that she had never heard of it and did not know what he was talking about, the doctor told her that she could expect her husband to get a lot sicker

before he got better. Inquiry was made, at apparently about that time, if Mr. Spencer had received the swine flu vaccine.[1]

Upon admission, Mr. Spencer was without any deep tendon reflexes. Within days, he experienced respiratory failure and a tracheostomy was performed. Further evidence of autonomic dysfunction came in the form of tachycardia, and failure of bowel and bladder function. Because of the extent of his paralysis, Mr. Spencer was tubefed, catheterized, on a respirator, and basically unable to perform any of his bodily functions without assistance. After Mr. Spencer lapsed into a deep coma, he was transferred on April 6, 1978, to St. Lukes Hospital in Kansas City, Missouri. Mr. Spencer succumbed to cardiac respiratory arrest secondary to Guillain-Barre Syndrome and died on April 30, 1978.

The foregoing description is based on the Court's recollection of the testimony and review of the Debbi Templeton deposition. It is adapted from plaintiff's proposed findings of fact. In addition, the Court adopts by reference defendant's proposed findings of fact, filed March 29, 1983, as follows: 1, 2, 3, 4, 6, 9, 10, 11, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, and 29. Proposed findings 5, 7, 8, 12, 13 and 22 are adopted, modified as follows:

5. From the time of his immunization until late March, 1978, decedent continued to work full time at Trans World Airlines as a mechanic, and was not afflicted with any symptoms or problems which fully impeded his work performance, or his participation in recreational activities such as bowling and camping.

7–8. Dr. Hayes' examination detected little or no hypesthesia on the left side of the face and no abnormalities elsewhere. Except for his face, decedent was apparently asymptomatic in February, 1977. Either the patient's reporting, the doctor's examination, or the doctor's records failed to reflect the full history of Mr. Spencer's symptoms, which did not appear to be threatening or chronic at that time.

12. On April 28, 1977, Dr. Hayes conducted an examination and found the decedent to be normal in all respects.

13. From April, 1977, until late March, 1978, decedent reported no neurological problems to doctors.

22. The typical course of GBS onset progresses to maximal neurological involvement occurring over a period of days.

## LIABILITY

The district courts and the medical profession are engaged in a continuing learning process with respect to the development of Guillain-Barre Syndrome after the swine flu inoculations. It is generally accepted that symptoms must develop within a limited number of weeks, as Dr. Moroney advised the Spencer family and as my colleague Chief Judge Clark has ruled in a companion case in this district, before a trier of fact can fairly infer causation. In the great majority of such cases, where causation appears, acute GBS rapidly develops. But in comparatively rare instances in which a low-grade, chronic malady develops, and later apparently flares into acute GBS, the courts and the medical profession are divided in their conclusions as to causation. A small number of experts, including Dr. Poser, have recognized a related phenomenon of "smoldering" and "flaring"; other experts have acknowledged "chronic" and "acute" GBS-type syndromes but do not believe they can be causally linked to the swine flu vaccine or to each other with any high degree of medical certainty.

---

1. Dr. Jean Moroney advised the family during Mr. Spencer's hospitalization that the vaccine could not have caused the illness because the time lapse between the inoculation and the acute illness was excessive. This doubtless caused the family members to reconstruct their memories of Mr. Spencer's physical condition during the previous 17 months. The Court recognizes that a serious theoretical possibility of fabrication exists. The testimony, however, is generally convincing. The imperfections and inconsistencies in the testimony lend it credence, in fact, and tend to dispel the possibility that the Court has been presented with a scripted scenario.

Plaintiff has supplied the Court with copies of some nine decisions, only one of which is published, which adopt the smoldering-flaring theory and impose liability on the government even though acute GBS did not develop until many months after the inoculation.[2]

The Court is aware that a plaintiff's appeal in a case of alleged smoldering GBS has recently been decided adversely to the plaintiff. *Lima v. United States,* 708 F.2d 502 (10th Cir.1983). This ruling affirms a decision of Judge Finesilver, published in 508 F.Supp. 897 (D.Colo.1981). The claim of sub-acute GBS was apparently quite weak, however, being dependent simply on proof of "general malaise and cold-like symptoms" which Judge Finesilver noted were "general to many other maladies." 508 F.Supp. at 901. The affirmance of the Finesilver decision may be inconsistent with the rulings of the district courts in several of the cases cited in footnote 2, but has little bearing in a case like this one, where there is evidence of early symptoms involving the hands and legs.

The published decisions do not establish a controlling line of authorities. *Barnes v. United States,* 525 F.Supp. 1065 (M.D.Ala. 1981), which favors the plaintiff, supports the theory that a mild form of GBS may be traceable to the inoculation. The plaintiff in that case apparently did not require medical assistance for her condition until some eleven months after the inoculation. More closely related to the Spencer experience are those recounted in the unpublished decisions in *Dillard, Carroll* and *Edenfield.*

In *Dillard,* the plaintiff suffered a generalized loss of stamina and strength, particularly in his feet and legs, and his legs "gave way" while attending a dance less than a month after inoculation. His noticeable weakness caused him to quit a basketball team during a season which began about six weeks after vaccination. He increased his exercise in January, 1977, (jogging and pushups) but did not regain his strength. In March he saw a doctor and complained of a cold, muscle spasms and cramps. In the spring he played softball rather than basketball and his ability to run and throw was notably below par. His condition improved somewhat toward the end of the season, in July. An acute illness occurred at the end of July and was diagnosed as GBS in August.

In *Carroll,* plaintiff developed acute GBS some 13½ months after his inoculation. Beginning shortly after the inoculation plaintiff complained frequently of fatigue and reduced his recreational activities. He had an early onset of a tingling sensation and pain in his legs and complained that his hands did not "work right." Numbness in hands and arms occurred within a few weeks of the inoculation. The sensation was that "a hand would go to sleep." The hand recovered its normal sensation after "a long period of time" (presumably the same day). Doctors diagnosed and treated plaintiff for upper respiratory infection, bronchitis and flu and a sore throat on three occasions during the year following the inoculation. No other symptoms were noted in medical records. The court concluded that plaintiff had been suffering from a rare chronic form of GBS prior to the acute illness.

In *Edenfield,* acute GBS caused plaintiff's hospitalization some eight months after her inoculation, but the Court held that a mild, chronic form of the disease was contracted within six weeks of vaccination. The disease then progressed to the point of acute symptoms in July, 1977, and the ultimate illness was attributed to the inoculation.

---

2. *Thompson v. United States,* No. 79–1017–A, slip op. (E.D.Va. November 6, 1980); *Smith v. United States,* No. CA–5–79–124, slip op. (N.D. Tex. May 7, 1981); *Sanders v. United States,* No. 80–31–N, slip op. (E.D.Va. July 1, 1981); *Barnes v. United States,* 525 F.Supp. 1065 (M.D.Ala.1981); *Dillard v. United States,* No. CV479–17, slip op. (S.D.Ga. October 30, 1981); *Carroll v. United States,* No. H–79–1589, slip op. (D.Md. June 18, 1982); *Hockett, et al. v. United States,* No. 79–4311–Civ–NCR, slip op. (S.D.Fla. November 1, 1982); *D'Antonio v. United States,* No. C–1–80–578, slip op. (S.D. Ohio February 4, 1983); *Edenfield v. United States,* No. 79–914–Civ.T–H, slip op. (M.D.Fla. June 1, 1983).

Perhaps the most thoroughly considered case favoring the government is *Adleson v. United States,* 523 F.Supp. 459 (N.D.Cal. 1981). While the facts of that case appear to be quite similar to the nine cases cited by plaintiff, Judge Schwarzer found a failure of proof, based on medical uncertainty. This Court does not follow Judge Schwarzer, for several reasons: (1) the decision in *Adleson* seems to rest on certain semantic or definitional problems within the medical profession, under which the disorder there claimed (chronic inflammatory polyradiculoneurapathy or CIP) was not classified as the mild or chronic form of GBS which other courts have attributed to the vaccination, (2) the prevalence of a medical history like Mr. Spencer's was less developed in *Adleson* than in the subsequent case law (five of the unpublished decisions, including all three of the most impressive analogies were decided after *Adleson*); and (3) the medical expertise in this case weighs more heavily in favor of the present plaintiff, and defendant does not develop a CIP-theory "defense."

Plaintiff's expert, Dr. Poser, is obviously well-qualified and familiar with all aspects of both past and current literature on the subject. The government's expert testimony was from less highly-qualified witnesses. Dr. Vernon I. Rowe, a local witness, was not unimpressive, but he appeared to testify more from knowledge of orthodox theories and materials published in past decades than from current and thorough familiarity with the applicable field. It may be argued that Dr. Poser is more of an advocate, having been retained in many of the swine flu cases, but the Court found his testimony more persuasive than that of the less-knowledgeable witnesses presented by the government.

Consideration of the medical issues does not, of course, turn entirely on Dr. Poser's testimony, but a detailed review of the pertinent literature and material presented to the Court would not be worthwhile. This would tax not only the Court's understanding of the details of the medical debate but also its ability to articulate the debated issues in medically-correct jargon. If this decision is appealed, plaintiff will doubtless provide a sophisticated analysis as was done in persuasive briefing to the Court.[3] The Court does emphasize, however, the usefulness of current expert testimony directed toward the facts of the case.

It is interesting that a change in the quality of expert testimony (including a presentation by Dr. Poser) apparently altered the view of District Judge Spiegel from rejection to acceptance of the theory of smoldering-flaring GBS. Contrast his recent unpublished opinion in *D'Antonio, supra,* filed in February, 1983, with his earlier unpublished opinion in October, 1982, in *Rebholz v. United States,* No. C–1–69–159, slip op. (S.D.Ohio 1982), in which Judge Spiegel generally followed the line of reasoning favoring the government and expressed in *Adleson, supra.*

In this case, Dr. Rowe's opinions may well have been influenced by skepticism about plaintiff's factual presentation, which the Court basically accepts. Assuming the soundness of the presentation, Dr. Rowe had little explanation for the events, and did not, for example, attempt to develop the CIP theory as a defense, using the *Adleson* approach. While Dr. Rowe offered a possible hypothesis that Mr. Spencer had suffered a mild stroke, this is not consistent with the Court's finding that there was at least some bilateral involvement. It also seems unreasonable to suppose that, if Mr. Spencer had experienced weakness and numbness strictly confined to his left side for more than a year, this striking symptom would not have caused him to seek additional medical advice.[4]

**3.** See, for example, "Plaintiff's Medical Brief" filed April 7, 1983, and medical articles submitted by plaintiff: Exh. A, p. 189; Exh. B, p. 1135; Exh. C, pp. 165–66; Exh. D, p. 894; Exh. F, pp. 595–96; Exh. H, p. 795; Exh. K, p. 432; Exh. M, p. 73.

**4.** The Court was generally impressed with Dr. Rowe's candor, and credits his sincerity in conceding that Mr. Spencer may possibly have suffered from smoldering or chronic GBS after the vaccination but that Dr. Rowe would not concede this was probable. The Court did con-

While the report of the consultation that occurred in February, 1977, regarding a palsy-like condition in Mr. Spencer's face, does support plaintiff's case only in part, and has tantalizing omissions, on balance it seems to confirm the presence of rather extraordinary physical problems close in time to the inoculation, and has some tendency to verify the family testimony of still earlier symptoms.

Ultimately the liability in this case does partly turn on the close chronological connection between the inoculation and the beginning of symptoms. The Court is aware that its reasoning may be criticized for indulging in the logical fallacy of *post hoc ergo propter hoc.* Timing is, however, sometimes "powerfully persuasive" that there is a causal connection. *Swanner v. United States,* 406 F.2d 716, 718 (5th Cir. 1969). "Alert avoidance" of the *post hoc* fallacy does "not require rejection of common sense inferences." *Id.* In some areas of the law, such as retaliatory discipline or discharge, courts often allow chronological progression to be treated as highly probative. *E.g., Gonzalez v. Bolger,* 486 F.Supp. 595, 601 (D.C.D.C.1980).

In the present context, a common sense inference of causation is supported by medical expertise of considerable authority and has been accepted in similar cases by some other courts. GBS does remain a somewhat mysterious ailment, and medical certainty remains elusive; but the Court is guided by the standard of "more likely than not" and, finding the facts in accordance with the family testimony, is comfortable with a further finding as to causation.

## DAMAGES

■ The earnings of Charles Spencer during the last three years of his life approximated $21,000 per year. Lost earnings were calculated by an accountant from April 1, 1978 until the decedent's retirement date in 1987 at age 65, in the amount of $116,483. The accountant treated the discount rate (interest) and the inflation rate

as likely to balance out. While there was cross-examination on this feature of the damage claim the government offered no other calculation of lost earnings, and the figure will be accepted as sound.

The present value of Mr. Spencer's pension right losses has been calculated at $20,526. Funeral expenses were $1,577.82 and hospital and medical expenses were $21,294.87. Total monetary loss is therefore $159,881.69.

In addition, plaintiff, the widow of Charles Spencer, is entitled to recover for loss of companionship. The Court notes a wide range of values placed on this factor. In *Wyatt v. United States,* 470 F.Supp. 116 (W.D.Mo.1979), affirmed 610 F.2d 545, the Court allowed a widower over $100,000 for loss of companionship of his wife, whose life expectancy was some 12 years. In *Bergmann v. United States,* 526 F.Supp. 443 (E.D.Mo.1981), rev. on other grounds, 689 F.2d 789 (8th Cir.1982), the Court allowed approximately $30,000 for loss of companionship of a husband, whose life expectancy was some 31 years. In the instant case, the parties had joint life expectancies of approximately 20 years. Although there was little testimony about the relationship of the parties, an award of $100,000 will be made, which would appear to be generous under *Bergmann* but modest under *Wyatt.*

It is therefore ORDERED that judgment be entered in favor of plaintiff in the amount of $259,881.69 together with costs.

---

clude, however, that there was marked exaggeration in the ultimate statement by the doc-

tor that the likelihood of early GBS in this case was "less than 1%."